In re Roger W. HARLOFF d/b/a Roger Harloff Farms d/b/a Hancock Farms d/b/a Johnson Farms a/k/a Immokalee Farm, Debtor.

Roger Harloff Packing, Inc. d/b/a Harloff Packing, Debtor.

Classie Tomato, Inc., Debtor.

Classie Sales, Inc., Debtor.

Classie Plants, Inc., Debtor.

Nos. 98–5120–8P1 to 98–5124–8P1.

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Oct. 28, 2002.

Robert A. Soriano, Tampa, FL, for debtors.

John A. Anthony, Tampa, FL, for Disbursing Agent.

Andre R. Perron, Bradenton, FL, for Cred. Comm.

## ORDER ON MOTION FOR SETOFF OF THE PROCEEDS ORIGINALLY INTENDED TO SATISFY ROGER W. HARLOFF'S CLAIM TO COMPENSATE FOR ADMINISTRATIVE EXPENSES INCURRED BY DISBURSING AGENT

ALEXANDER L. PASKAY, Chief Judge.

**THIS CASE** came before the Court for a final evidentiary hearing on the Motion for Setoff of the Proceeds Originally Intended to Satisfy Roger W. Harloff's Claim to Compensate for Administrative Expenses Incurred by Disbursing Agent. The Motion was filed by Larry S. Hyman (Hyman), as the disbursing agent in these chapter 11 cases.

The relevant part of the record reveals that on August 3, 1999, the Court entered an Order Confirming the Amended Joint Plan of the Debtor and the Official Committee of Unsecured Creditors, as Modified. (Doc. 684). The Plan as confirmed was a liquidating plan, which provided for the liquidation of the assets of the Debtors, as well as the assets of certain non-debtor entities. The Plan further provided for the distribution of the proceeds of the liquidation to creditors and to the Debtor, Roger W. Harloff (Harloff). (Doc. 684, Order Confirming Amended Joint Plan, pp. 2–3).

In the Motion under consideration, Hyman asserts that the terms of the Plan providing for a distribution to Harloff were included in the Amended Joint Plan "in reliance upon Harloff's agreement to facilitate the orderly liquidation process." (Doc. 1077, Motion for Setoff, ¶ 3). Hyman contends, however, that Harloff not only refused to cooperate with him in the liquidation of the assets, but that Harloff also concealed significant assets and was "deliberately subversive" of Hyman's efforts as the disbursing agent. (Doc. 1077, Motion for Setoff, ¶ 8). Consequently, Hyman requests that the Court authorize Hyman, as the disbursing agent, to "disregard the contemplated tithe to Harloff pursuant to the Plan in making distribution to creditors." (Doc. 1077, Motion for Setoff, p. 7).

### I. The Confirmed Plan

The Amended Joint Plan of Reorganization of Debtors and Official Committee of Unsecured Creditors was filed on June 1, 1999. (Doc. 532). Paragraph 3.06(b) of the Amended Joint Plan provides:

**3.06 Impaired (Insider) Classes of Claims.**

.         .         .         .         .

(b) **Roger Harloff Distribution.** *In exchange for his efforts in liquidating the Assets and producing the Crops that have resulted in Cash for Creditors,* Roger Harloff shall retain under the Plan:

(i) The Exempt Assets, subject to any Liens thereon;

(ii) The R. Harloff New York Property, subject to any Liens thereon;

(iii) The 1 Acre Lot, subject to any Lien thereon;

(iv) That certain Cessna aircraft, subject to any Lien thereon;

(v) *10% of the Net Proceeds, after payment of Liens thereon, Allowed Administrative Claims, and Allowed Priority Claims;* and

(vi) His stock in Classie Re–Pak, HFETI and HPETI.

(Doc. 532, Amended Joint Plan, ¶ 3.06(b), pp. 37–38) (Emphasis supplied). "Net Proceeds" are defined as "the proceeds from the sale or liquidation of any Asset, ... after deducting costs incurred in realizing those proceeds, ... tax Liens, and the Liens of holders of Secured Claims on the Asset being sold or liquidated." (Doc. 532, Amended Joint Plan, p. 19).

Harloff contends that he is entitled to payment of "10% of the Net Proceeds" in accordance with paragraph 3.06(b) of the Plan. Specifically, Harloff claims that significant assets of the estate were sold prior to confirmation of the Plan. A farm located in Manatee County, for example, was sold shortly before confirmation, and generated approximately $2.2 million for the estate. Harloff contends, therefore, that the distribution contemplated by the Plan was already earned as of the date of confirmation, and that he has the absolute right to the payment.

The Court is satisfied that the distribution to Harloff provided in paragraph 3.06(b) of the Plan was intended to compensate Harloff for his *future* cooperation with the disbursing agent, and not for the preconfirmation sale of the Manatee County farm.

■■■ The Court reaches this conclusion for at least two reasons. First, § 1107(a) of the Bankruptcy Code provides:

**11 USC § 1107. Rights, powers, and duties of debtor in possession**

(a) Subject to any limitation on a trustee serving in a case under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights, other than the right to compensation under section 330 of this title, and powers, and shall perform all the functions and duties, except the duties specified in sections 1106(a)(2), (3), and (4) of this title, of a trustee serving in a case under this chapter.

"Because Section 1107(a) of the Bankruptcy Code vests the debtor-in-possession with the powers and duties of a trustee, the debtor-in-possession is an officer of the court, as well as a statutory fiduciary of the bankruptcy estate." *Hansen, Jones & Leta, P.C. v. Segal,* 220 B.R. 434, 457 (D.Utah 1998). "With certain exceptions not relevant here, a debtor-in-possession performs the same functions as a trustee in a reorganization.... As one of its duties, a trustee is not only entitled to but *must* collect the property of the estate." *Louisiana World Exposition v. Federal Insurance Company,* 858 F.2d 233, 245–46 (5th Cir.1988) (Emphasis in original). "The fiduciary duties which the debtor assumed by filing chapter 11 must result in self-imposed limitations on self-compensation." *In re Herberman,* 122 B.R. 273, 282 (Bankr.W.D.Tex.1990).

■■■ It is clear from § 1107(a) and the cases arising thereunder that a debtor in possession has the duty to assist in the administration of the chapter 11 estate. The duty continues for as long as the debtor remains a "debtor in possession," which typically consists of the period before confirmation of the chapter 11 plan. It is also clear that the duty is an incident of the debtor's status as debtor in possession, and that the debtor is not generally entitled to payment for his services in collecting the assets of the estate. See *In re Concrete Products, Inc.,* 208 B.R. 1000, 1007 (Bankr.S.D.Ga.1996) ("The Bankruptcy Code also establishes numerous duties of a debtor-in-possession and expressly excludes any separate entitlement to compensation under Section 330.")

■■■ Based on these authorities, the Court concludes that the distribution con-

templated to Harloff under the Plan did not constitute compensation for his efforts prior to confirmation. Such efforts amounted only to the fulfillment of the statutory obligations that Harloff incurred under the Bankruptcy Code as a debtor in possession. Instead, the Court finds that the payment could only have constituted consideration for Harloff's prospective cooperation after confirmation of the Plan.

Second, the Amended Joint Plan was confirmed by the Court on August 3, 1999. (Doc. 684). The Order confirming the Plan provides in part:

> [T]he Court recognizes that the Plan allows Roger W. Harloff to retain more than he would in a Chapter 7 case, but finds that the following benefits under the Plan to general unsecured creditors, such as the Pallardy Parties, outweigh the value of the distributions to Harloff.
>
> .    .    .    .    .
>
> 4. The assets of the Debtors not already sold, including cattle, must be liquidated promptly. The delay that would result if the Plan were not confirmed and implemented promptly would result in loss to these estates.

(Doc. 684, Order Confirming Amended Joint Plan, pp. 3–4). The Order of confirmation, therefore, expressly ties Harloff's distribution under the Plan to the postconfirmation liquidation of assets of the estate. In other words, Harloff's receipt of more than he would have received in a chapter 7 case was justified in part by the prompt *postconfirmation* sale of the assets.

The distribution provided in paragraph 3.06(b) of the Plan was intended to compensate Harloff for his future cooperation and postconfirmation assistance to the disbursing agent. The distribution was not already earned as of the date of confirmation.

This leads to the consideration of Harloff's postconfirmation conduct in connection with Hyman's attempts to collect and liquidate the remaining assets of the estate.

## II. Harloff's conduct

The Plan provides for payment to Harloff of an amount equal to ten percent of the net proceeds generated from the liquidation of the assets of the estate "in exchange for his efforts in liquidating the Assets." (Doc. 532, Amended Joint Plan, ¶ 3.06(b)). The Court has determined that the payment represented compensation for his postconfirmation efforts in the liquidation process.

The Court finds, however, that Harloff did not fulfill his obligations under the Amended Joint Plan. On the contrary, the evidence shows that Harloff was wholly uncooperative, hostile, and deceitful during the disbursing agent's efforts to liquidate the assets.

Harloff did not appear at the final evidentiary hearing to explain his conduct. The record establishes, however, that Harloff failed to perform his duties under the Plan in several respects.

**A. The Tennessee property.** Approximately six weeks after confirmation, on September 17, 1999, Hyman filed a Notice of Intention to Sell certain real property located in Tennessee, together with the improvements thereon, to Greyrock, Inc. for the purchase price of $1,925,000. (Doc. 796). According to the "Description of Real Property Being Purchased," attached as Exhibit A to the Real Estate Purchase and Sale Contract, the property subject to the sale included "all crops, minerals and mineral rights of every kind and nature on the property." Additionally, Hyman testified that the parties intended for the sale to include all crops growing in the field.

An Order Authorizing Sale of Tennessee Packing Facility to Greyrock, Inc. was entered on October 29, 1999. (Doc. 886).

Between the time that the Purchase and Sale Contract was signed and the date that the sale was to close, however, Harloff cut down approximately sixty acres of corn that was growing on the Tennessee property. Hyman testified that Harloff admitted that he cut the corn, and also testified that Harloff refused to disclose where the corn had been stored after it had been cut.

As a result of Harloff's conduct, the purchase price for the property was reduced by the sum of $140,000. According to Hyman, the reduction represents a settlement with Greyrock, Inc. regarding the corn crop that had been cut from the field, as well as certain equipment that Harloff had removed from the property prior to closing, and other less significant matters.

The corn ultimately was recovered and sold for $3,000. Hyman testified that a substantial portion of the corn was missing by the time that it was discovered. The equipment that was removed by Harloff was eventually recovered and sold for $10,000.

**B. The Immokalee property.** The deposition of Harloff was taken on February 8, 2000, in connection with an adversary proceeding styled *Larry S. Hyman, the disbursing agent v. Roger W. Harloff*, Adv. No. 99–614. (Exhibit 6). In the deposition, Harloff testified that no farm equipment belonging to the estate was located on Harloff's farm in Immokalee, Florida at that time. (Exhibit 6, Sworn Statement of Harloff, pp. 89–91).

Hyman testified, however, that he knew that Harloff's sworn statement was false at the time that it was made, because Hyman had visited the farm in Immokalee only five days earlier, on February 3, 2000. It appears that the visit to the farm was triggered by a report from Sandy Biggers (Biggers) that Harloff had hidden various equipment in or near Immokalee. Hyman had engaged Biggers to locate any assets that Harloff had concealed in exchange for a "finders fee" equal to 20 to 25 percent of the amount recovered.

In any event, during his visit to the property on February 3, 2000, Hyman discovered major items of equipment spread across the area. Hyman and his counsel documented the discovery of the equipment with photographs and a videotape. (See Exhibits 7, 9, 10, and 11; Photographs, videotape, and tape recording). Hyman testified that the identification numbers on the equipment that he found established that it was property of the estate.

Following his deposition on February 8, 2000, Harloff turned over certain equipment to Hyman, and Hyman sold the equipment at an auction for the sum of $101,000. Certain other equipment, however, was never surrendered by Harloff. Hyman was required to locate and assemble the concealed equipment without assistance from Harloff. Hyman ultimately sold the equipment at an auction in September of 2000 for an additional $101,000.

**C. Other trucks and equipment.** Hyman testified that Harloff admitted to him that Harloff had taken two trucks from the estate's property in Florida. Hyman also testified that Harloff acknowledged that he had taken certain trucks and equipment from the property in Tennessee. According to Hyman, when questioned about the trucks and equipment, Harloff stated that they belonged to him, that he had them in "safekeeping," and that Hyman "had everything that he needed."

Hyman's testimony regarding the trucks and equipment taken by Harloff is not contradicted.

Based on the foregoing, the Court is satisfied that Harloff failed to perform his obligations under the Amended Joint Plan. The evidence is clear that Harloff was wholly uncooperative and deceitful in connection with Hyman's efforts to liquidate the assets of the estate.

### III. Relief requested

Hyman seeks the entry of an Order authorizing him to "disregard the contemplated tithe to Harloff pursuant to the Plan in making distribution to creditors." (Doc. 1077, Motion for Setoff, p. 7). Hyman's request for relief is based on two alternative theories.

First, Hyman asserts that "Harloff's conduct since confirmation of the Plan justifies that the distribution contemplated above be withheld from Harloff based upon failure or lack of consideration." (Doc. 1077, Motion for Setoff, ¶ 13, p. 6). In other words, the consideration for the distribution consisted of Harloff's postconfirmation cooperation and assistance in liquidating the assets of the estate. Since Harloff refused to provide such assistance, the distribution fails for lack of consideration.

Second, Hyman contends that he has incurred substantial expense in the course of administering the estate "as a result of Harloff's willful misconduct and his affirmative action to hinder assets of the Debtors." Accordingly, Hyman seeks the entry of an order allowing him to set off such expenses against the distribution that would otherwise be due to Harloff under the Plan. (Doc. 1077, Motion for Setoff, p. 1).

■ Considering Hyman's two contentions seriatim, the Court is satisfied that Harloff is not entitled to any distribution under the Plan, because the payment contemplated by paragraph 3.06(b) of the Plan has failed for lack of consideration. The record leaves no doubt that Harloff did not furnish any postconfirmation assistance to Hyman in connection with Hyman's efforts to liquidate the remaining assets of the estate. Harloff's failure to furnish any such assistance is evidenced in part by his conduct with respect to the Tennessee property, the Immokalee property, and the trucks and equipment concealed by Harloff, as described above.

If it is assumed, without conceding, however, that Harloff provided some postconfirmation benefit to the estate, the next issue involves Hyman's alternative contention that the damages experienced by the estate as a result of Harloff's conduct should be set off against the distribution set forth in paragraph 3.06(b) of the Plan.

The expenses attributed to Harloff's misconduct include the following:

1. The loss of $140,000 in connection with the sale of the farm in Tennessee. The initial sale price for the property was in the amount of $1,925,000. As a result of Harloff's conduct, however, Hyman was unable to deliver certain crops and equipment to the buyer, and the sale price was reduced by the sum of $140,000.

2. Hyman's fees and costs related to his services in recovering assets of the estate. According to Hyman, the total amount of the fees and costs incurred by him for the period commencing in August of 1999 and ending in December of 2000 equals $28,966.43. (Exhibit 15). Hyman testified that this sum is attributed only to those services related to the recovery of assets, and not to other services that would have been performed regardless of Harloff's conduct.

3. The fees and costs incurred by Hyman's counsel in connection with the recovery of assets. (Exhibit 16). Hyman contends that his attorney's fees exceed the

sum of $47,906.75. (Doc. 1077, Motion for Setoff, p. 4).

4. The payment of a "finder's fee" to Sandy Biggers and other individuals who were engaged to locate assets of the estate that had been concealed by Harloff. The finder's fees total $51,053.48. (Doc. 1077, p. 5).

5. Additional expenses associated with the auctions of estate property that were conducted after the initial auction in October of 1999. Hyman testified that the costs related to the subsequent auctions exceeded the amount that he would have paid had all of the property been included in the original auction in 1999. Although the total amount of the additional cost is unliquidated, Hyman testified that the extra expenses include storage charges and charges incurred to haul or move the equipment after it was located.

The cost incurred by the estate as a result of Harloff's misconduct exceeds the sum of $267,926.66 ($140,000 + $28,966.43 + $47,906.75 + $51,053.48 = $267,926.66).

Harloff's claim under the Plan equals the sum of $157,525. (Exhibit 20). This figure represents ten percent of the cash generated by Hyman from the liquidation of the assets of the estate, less priority claims and remaining administrative expenses ($2,332,670 minus $682,424 minus $75,000 = $1,575,246).

Since the additional costs incurred by the estate (>$267,926.66) exceed the amount that Harloff would have received under the Plan ($157,525), Hyman contends that the entire distribution should be withheld from Harloff as a result of the setoff.

## IV. Conclusion

Harloff is not entitled to any distribution under paragraph 3.06(b) of the Plan because he failed to furnish any postconfirmation assistance to Hyman, as required by the Plan.

Even if Harloff had provided some postconfirmation benefit to the estate, however, the record more than warrants the finding that Harloff engaged in affirmative conduct to sabotage Hyman's efforts to liquidate the assets of the estate, and that the damages suffered by the estate as a result of Harloff's conduct far exceed Harloff's claim under the Plan.

> The right of set-off is based on principles of right, justice, and benevolence.... Set-off contemplates the right existing between two parties to set off their debts by mutual deduction. It is not incompatible with the justice of plaintiff's claim but seeks to balance it in whole or in part by a counter obligation alleged to be due by plaintiff to defendant in another transaction.... Set-off does not require an equal balance.

*Chappell v. Chappell,* 253 So.2d 281, 283 (Fla. 4th DCA 1971)(quoting 80 C.J.S. Set-off and Counterclaim, § 3). A party seeking to assert a right of setoff must show that the debts subject to the setoff are mutual, meaning that they exist "between the same parties standing in the same capacity." It is not required that the debts arise from the same transaction. *In re Tower Environmental, Inc.,* 217 B.R. 933, 940 (Bankr.M.D.Fla.1997)(quoting *In re Apex International Management Services, Inc.,* 155 B.R. 591, 593–94 (Bankr. M.D.Fla.1993)).

In this case, the claims at issue are (1) Harloff's claim against Hyman, as Disbursing Agent, for the "10% of Net Proceeds" due under the confirmed Plan, and (2) Hyman's, as Disbursing Agent's, claim against Harloff for the additional expenses incurred by Hyman as a result of Harloff's failure to comply with his obligations under the Plan. The claims exist between the same parties in the same capacity, and therefore constitute mutual debts. The equitable principles underlying the doctrine of setoff permit the allowance of a setoff in these circumstances.

Since the claim asserted by Hyman against Harloff exceeds the amount of the distribution to Harloff contemplated by the Plan, Hyman should be allowed to withhold the payment to Harloff in its entirety.

Accordingly:

**IT IS ORDERED** that:

1. The Motion for Setoff of the Proceeds Originally Intended to Satisfy Roger W. Harloff's Claim to Compensate for Administrative Expenses Incurred by Disbursing Agent, filed by Larry S. Hyman, as the disbursing agent in these chapter 11 cases, is granted.

2. Larry S. Hyman, as disbursing agent, is permitted to disregard the provisions of paragraph 3.06(b)(v) of the Amended Joint Plan of Reorganization, as confirmed by the Order entered on August 3, 1999. Hyman is authorized to withhold payment to Roger W. Harloff of "10% of the Net Proceeds," as described in paragraph 3.06(b)(v), in making distribution to creditors in these chapter 11 cases.